Our first case this morning is case number 416-0946. The people of the state of Illinois v. Avery Berry. And for the appellant, we have Ms. Kinstrand. And for the appellee, Ms. Brooks. You may proceed, counsel. Good morning. Today, in please supporting counsel, I represent appellant Avery Berry. I intend to address the first argument focusing on the race issue, and the last issue challenging Avery's sentence. I'm happy to address some other arguments that the court will shift, and I intend to use my allotted time. And, counsel, I'm going to ask you to speak up a little bit. That microphone does not amplify your voice. It simply records, so just keep your voice up if you would so everyone can hear. Thank you. I will do my best. First, Avery was denied a fair trial, where the court prevented him from presenting evidence of prior altercations that deceded during defense's case. There was no real dispute that defense of others was at issue. And, in fact, the state agreed to a second pre-murder instruction based on imperfect self-defense. Counsel, let me ask you. Specifically, what would that evidence have been? I know from the record that your client made a statement about something that had been going on all summer, and there were problems all summer. But is there something other than that that would have been presented had the court allowed it? Well, I think there are a couple sources in the record that speak to what this evidence would have been. First off, in the pro se motion that was filed that was the subject of a parental issue in this case, the counsel had indicated that Avery provided him with a written list of a number of incidents. And second was the testimony of the mitigation witnesses. If you recall, in mitigation, he called both his parents and two of his siblings, and there was an indication that there had been a prior altercation with members of this group, and that someone had showed up at the house wanting to fight Avery, and that the police were called. And I think Avery's indication that their lives had been threatened all summer, and that the fighting had been going on all summer, is sort of consistent with this escalating series of altercations. But do we know with whom these problems occurred? I mean, was it specifically the deceased, or someone related to the deceased? My impression was that it was the deceased and the same cohorts that were involved in the fight that took place at the house prior to the shooting, and also who were involved in the fight that took place earlier. And I do want to point the court to something in Lynch. There is a portion of Lynch that's on page 202 in that opinion that says, When the trial court is open and hostile to admitting evidence of the deceased's violent and aggressive character, a formal offer of proof is not required. Quote, If a question shows the purpose and materiality of the evidence is in a proper form and clearly admits of a favorable answer, the proponent need not make a formal offer when the answer would be, unless the trial, a formal offer would be, unless the trial court asks for one. And I think here, the trial court was clearly hostile to this evidence. I mean, it's proper to bring this evidence out on the defense's case. I mean, I address the issue of the motions moving the offer of proof in the brief. But I think it's clear, the court procedurally was not inclined to let this in, but also suggested that Avery is raising a new defense. And I think clearly that was not the case. I think clearly this was, this evidence, as most of the cases say, as Lynch says, was directed toward his claim of defense of others. And it should have come in. And, you know, I think we do have enough in the record in this case to show that this evidence was relevant. You know, there had been an escalating series of events. And the shooting and the previous fight in the bar, they didn't occur in a vacuum. You know, there was, it was obvious that the two seat in this case was the initial aggressor. He was aggressive at the bar. And I think tellingly, he also wasn't deterred by the presence of a gun. We have evidence in the record that suggests both at the bar, Avery's brother, Shaquille, pulled out a gun. And it just simply didn't matter to the decedent. The decedent was interested in having an altercation. And then the decedent and his brothers and some friends went back, formulated a plan to go over and confront Shaquille and Avery and the other attendees at the party. And again, we see that he wasn't deterred by the presence of a firearm. And, you know, I think on one view of the evidence in this case, Shaquille was trying to get away. I mean, Shaquille jumped on a car. You made the gun around, I think, in an effort to deter what was going to be a physical altercation. Trying to get away when someone comes to the home and you come out and agree to basically get into an altercation with them? Well, I don't think he wanted to get into the altercation. Did he have to come out? I don't think he had much of a choice. I think they were going to leave him out and hang around at that house. I mean, this is, again, and that points to the importance of this lynch evidence, right? If they've been kind of bullied all summer long, and then they show up after having this sort of violent altercation at the bar when the decedent pushes somebody into a glass entertainment event, and then they come over to their house, you know, I don't know what more they could do. There was even an indication- Well, call the police, but, you know, hindsight is 20-20. A tragedy could have been avoided. Well, also, I think there was evidence in mitigation that they had called the police before, and the police simply didn't do anything. And I think even Avery said that in that location, that they didn't get any help from the police. That was referring to a prior incident that really isn't well-defined. It sounds unwell-defined, but, again, I would point out the lynch. I think it's fairly evident in the record what that evidence would show. And I would also point out that, you know, the jury was affirmatively misled as to how they were supposed to view all of this evidence. I mean, I think the prosecutor erroneously, but successfully, made this about whether or not Shaquille was injured. And, really, a matusas, which is a case, an old case, you know, in the Supreme Court that's having a brief, says the decedent doesn't have to be armed, and, you know, the victim of the beating doesn't have to suffer a great bodily injury before invoking justification. Before using force to counter force. And I think in this case, you know, the prosecutor made much of the fact that Shaquille, after the fact, didn't suffer any injuries. But, what was key was Avery's state of mind. And Avery's state of mind at the time, based on his testimony, was that he was scared, he was riled up, he was frightened. And these individuals, they simply would not stop. They started this fight earlier at the bar. And then they show up at the house at two in the morning. But he was, the defendant was allowed an instruction with respect to imperfect defense of others, right? Right. He was allowed an instruction, but he was never, the jury was never given a lynch instruction. And if you recall, the jury sent out a question asking specifically about how to determine unreasonableness in the context of the mitigating instruction. And so even to the extent that there was this evidence of this prior altercation, the jury simply wasn't told how they could evaluate it in the context of justification or imperfect self-defense. And again, they were affirmatively mistold by the prosecutor during closing arguments that, you know, they had to find that Avery, or Shaquille, was severely injured in order to invoke this. I mean, and again, I would point out the prosecutor also characterized this as a cold-blooded murder. And the facts simply don't bear that out. I mean, Shaquille, first of all, was a 19-year-old. He was not involved in this altercation, but he was witnessing all of these fights break out. He saw his brother being beaten up. The deceit was on top of him in the backyard. And multiple state's witnesses said that they overheard Shaquille yell, shoot him, shoot him, shoot him. But your client testified that he didn't hear that. Well, the testimony, in fact, is that he didn't remember. And I actually think that's consistent with what was going on. I mean, if you were a 19-year-old faced in that situation, and your older brother was being beat up in the backyard, and again, in the context, which is why this whole issue is important, if you've got this ongoing series of altercations, of escalating altercations, then what matters is the perception that Avery had, his state of mind at the time of the shooting. And I think we can say, based on all of the state's witnesses, with a high degree of confidence, that Shaquille actually did yell to his brother. He said he didn't remember, but I think it's pretty clear that that's what happened. And I think, in that sense, a 19-year-old may not have the impulse control or the foresight to know the consequences of his actions, but I think when your older brother is being beaten up, somebody's on top of him and he's screaming at you, I think he reacted in a way that is not necessarily unreasonable, that is not hard for somebody to understand, particularly going through everything that they apparently went through with this group of people. And the jury, bottom line is the jury should have been constructed as to how to use the evidence that was in the record, and the trial court just simply erred in not letting this come in. It was not a new defense. It was consistent with his self-defense, and he had a right to bring it in. And for that reason, this error was highly prejudicial and not harmless to his jury trial. But we can have confidence in this verdict, and he should get a new trial and be allowed to develop this issue and bring in his evidence. The second issue I'll address is the issue of sentencing, and I will note that I filed on Monday, and I know we had some problems... Counsel, let me interrupt you there. Do you intend to address the Crankle issue? I'm happy to address the Crankle issue. Because it appears to me that you have suggested there was an improper Crankle inquiry and the state has conceded, and therefore we would need to remand this case, and the issues that you're arguing today wouldn't be something that we would decide. Well, I'm happy to address that. I know there's been a lot of litigation in this district about the proper procedure in terms of preliminary Crankle. You're right, Your Honor, the state has conceded that there was not an adequate preliminary Crankle inquiry. My concern is, I don't think that these issues, as the court suggested in Bell, would be mooted by a Crankle inquiry. I mean, the purpose of the Crankle is really to decide whether the... Well, I think even the state has agreed that as long as this court retains jurisdiction of the issues you've raised in this appeal, that the case can be remanded to do the Crankle inquiry. So that would address your concern about whether your client's going to lose the right to have his issues addressed. Right? Correct. And my goal is to make sure that my client gets a full and fair and direct appeal. So whether these issues are addressed now, or whether they're addressed following a Crankle remand, both would, to me, satisfy that. Of course, as I suggested both in my opening brief and my reply, I want to make sure that he got the opportunity to file any kind of supplemental brief addressing the outcome of the preliminary Crankle inquiry. I wanted to ask you about that, because there seems to be a dispute between the parties as to how this would come back if we do remand it for a Crankle. Your position basically is that your client would also be able to appeal the resolution of the Crankle inquiry, correct? Correct. And the state is saying no appeal is available regarding the resolution of the Crankle claim. You can come back on the other things you've raised in your brief for this time around. Is that your understanding of the positions? That's my understanding of the positions, although if you're retaining jurisdiction to reconsider the issues following a remand, it would seem to me that that would be part of whatever you do after retaining jurisdiction. I mean, certainly there's many cases in which there's been appeals from Crankle remands. I think I cited some of that in the briefs. But I would also point out, you know, in Patrick, which was the Illinois Supreme Court case that was decided in 2011, the appellate court went through and considered the claims raised on direct appeal and then also said they were going to remand. So, you know, this is a... Coming from the First District, this is a bit of unusual procedure. In most of my cases, the court has gone ahead and addressed the issues because the Crankle remand, you know, again, as I suggested, it only entails a possibly neglected case. It's not actually a full-blown determination of whether there was an effectiveness, number one. And number two, just from an efficiency standpoint, I think, you know, here, with respect to the first issue, I'm addressing this as trial court here. I mean, it's not just an ineffective assistance of cultural claim, although I've raised that in alternative too. So if you found that the trial court had erred in letting this in, I think that would sort of move the Crankle inquiry. And, you know, from an efficiency standpoint, I think that it makes sense to address this now. But in all cases, my aim is to get my client a full and fair direct appeal, which is what he's entitled to under the Constitution. So whether we do that by, you know, remanding it and perhaps doing status reports with this court to go through the process, or I don't know if they assign a new appellate court number and then we would consolidate it with this. However this court would like to do it, I would just respectfully ask that you include that in your opinion, along with if you intend to retain jurisdiction so that everybody is aware of the process and so that we can adequately address his claims on appeal and whatever was raised in the Crankle. So I'll turn briefly to the final issue, which was the sentencing issue. And as the court might be aware, I filed on Monday a motion to cite as additional authority the recently issued decision at Peabody House. I had cited House in the brief and noted that the court had been ordered to vacate the decision and reconsider it in light of Harris and that when we reissued the decision it was basically the same decision. House is important because it indicates that clients like Avery, who are 19 years old at the time, should benefit from a consideration of the Miller factors. Here, again, he was 19 years old. I think the facts of his case show this case is the type of defendant that Miller was meant to apply to. He had a very difficult upbringing. He had mental health issues. He had diagnosed mental health issues. And he was basically bouncing around from house to house for most of his teenage years. And again, as I pointed out with the Lynch issue, there was a level of impulsiveness there. That I think is exactly the type of issue Miller was designed to address. So I think the record establishes that Miller should apply to him. I think House provides a very detailed explanation of emerging science behind applying this to so-called emerging adults and the changes in the law that suggest it should also apply to emerging adults, at least a 19-year-old. And he was only a few months over the age of 18. And I would also say that since Buffer was decided, it really changes the calculus for trial courts. If they're not thinking about applying the Miller factors, which I think was the case here, knowing that the cutoff would be 40 years changes how you're going to weigh all those factors and how you're going to consider what type of sentence you're going to impose against a defendant. And I certainly think that there's nothing in this record that suggests that Avery is irredeemably incorrigible or depraved or... I mean, he is a client that can be rehabilitated. The facts of this case are not likely to reoccur. I mean, this was precipitated by the decedent as the initial aggressor. There's no indication that he had a violent background. I think he had a technological occasion for burglary. There's no indication that there was any other acts of violence in his background. And a 50-year sentence is, by all accounts, a narrow and unreliable factor-of-life sentence. And I would ask the court to re-enact this matter for new sentencing in addition to all the relief that I said. And, counsel, another argument that you made in your brief was that one of the instructions should have been for serious provocation. Are you still standing on that position? Yes, I am, because I think the case law I cited is that if there's a family member that's being beaten up, that can qualify as strong provocation. I mean, the cases are old. There's not a lot of new cases there, but there are cases that suggest that, you know, when you see somebody like Avery did, he saw his older brother being beaten up, I mean, there's a natural familial reaction. And, again, I would point out that he did... In order to raise that, he didn't have to show that Shaquille was severely injured. I mean, that's just not... Thank you, counsel. Ms. Brooks? Good morning, Your Honors. May I speak to the court? Counsel. My name is Allison Paige Brooks, and I appear on behalf of the people. With respect to the defendant's claims under the evidentiary rulings, the argument that they're making here was rejected on the ground that it was beyond the scope of the prosecution's cross-examination, because the defendant's first attempt to elicit the information about prior... the details about prior altercations is redirect examination. And at that point, when the prosecutor objected to it, it was beyond the scope. The trial court agreed, because the defense counsel is going beyond the scope of the prosecution's cross-examination. And the defense is not denying his constitutional right to present a defense when the trial court is applying rules of evidence properly that are consistent with due process. In other words, if it's a valid rule, if the rule itself doesn't violate the Constitution, then the trial court can apply that rule and bar evidence that doesn't comply with rules of evidence and does not violate the defense's constitutional right to present its defense. Ms. Brooks, refresh our memory. I remember reading it in the record, but can you state for me again what question the prosecutor asked? Because I believe it was a question asked by the prosecutor of the defendant, and then it was when the defendant's counsel went to follow up on that, that the objection came. What was the initial question by the prosecutor that defense counsel said, that's why I asked this? Right. So what happened is the defense initially testified in direct that he had been confronted with the situation before and said it happened all summer. Now, that was his chance to provide the details if he wanted. Now, the prosecutors then asked specifically about the testimony the defendant provided on direct examination that he was scared for his brother's life. That is the question that he was asked. The defendant said he thought that his brother was in danger of being killed, and then the prosecutor specifically asked, quote, was that based upon the fact that he was severely injured in some way? No. Then the defendant volunteered something, not responsive at all to that question from the prosecutor, then said it was based upon the fact our lives were threatened all summer. So he had a chance to explain what these prior objections were on direct examination, and it was not at all responsive to the question, which is, was he being severely injured in any way? Let me ask a question. Yes. If he was then asked on direct, was there anything else that made you fear for your brother's life in addition to what was actually happening in front of you? You contend or suggest that he would be able to say there was an escalation, this was happening all summer, dot, dot, dot, and could have explained the context better. To the extent that Lynch permits the defendant to testify about prior matters that happened before the crime of which the defendant had been aware of at the time of the crime that would inform his mental state. The other issue is... That would be the case here if that testimony was true. For that problem strictly. The other problem deals with conflicts about who was the initial aggressor, which the state doesn't believe actually applies here. But to the extent the defendant would have known about certain incidents, if he had knowledge of those incidents, and would have informed his mental state that it would have been relevant under Lynch, as long as he had attempted to introduce it into direct examination... Isn't that a pretty powerful example of ineffective assistance at counsel? Well, it's not really under direct appeal because this court stuck with the record, the limited record here, that of course it can be developed... Right, I understand. But just take the stark reality of defense counsel failing to provide context that was in addition to what he saw when the crime occurred. The impact that would have on the jury. Well, the point is, could that be considered under the first clause of Strickland as being incompetent representation or objectively unreasonable representation to essentially get tripped up by a pool of evidence but not admitting it at the time that the trial court ruled on it but then trying to do it later when it was improper and having that evidence barred. Yes, that could potentially meet the first clause of Strickland. It's at least arguable. It's at least an arguable, yes. But you have to assume that the evidence was there of the prior incidents, that it would have been evidence that definitively demonstrated that there had been prior incidents. Well, the part of the issue that I believe they're also raising is that counsel is also ineffective for failing to make the offer of proof to get this information on the record. And to the extent that could also be incompetence, that it could be a viable argument as well. But the problem is, without the offer of proof, there's really no way for this court on this record to make the claim, to extend the claim. To failure to make the offer of proof piled on top of not doing it right to start with. Right, but... I don't know how he could have been less effective. Well, could there be an explanation, though, that I checked into this, I investigated this, and the people I talked to could not corroborate, or there's nothing corroborating this supposed prior incident or incidents. Then there would be no basis to make an offer of proof because you have no proof. Am I wrong? I'm not sure I quite follow. I guess what I'm saying is, he was talking about the fact that they had been threatened all summer, and that he feared for his brother's life because of these prior incidents. Opposing counsel stepped up and talked about the escalating problems between these groups. If defense counsel in this case investigated that and determined that there was no escalation, there was no prior incident or prior incidents, then what is there to make an offer of proof on? What evidence is there to present? Well, the defendant still has constitutional right to testify against the defendant. So if the only evidence of the prior altercations is his own testimony, and the defense attorney should have presented that in his direct examination, then that could be the offer of proof. It doesn't have to be a third-party witness or some sort of objective videotape or something with prior incidents. But the state's main argument here is directed to the separate prejudice problem of Stuart Dillon, which is, without the offer of proof, without something concrete in the evidence, in the record, there's nothing really... I'm not sure where the defense says that this was escalating. I'm not sure exactly where in the record they cite that to. I know there's some sort of reference to some other incidents that happened after the defendant's incarceration, but then that's in, like, a statement of elocution. But he's talking about still fearing for his life. Well, okay, but that happened after the incident. The incident, the shooting was, like, October 23, 2014. He was arrested in December 15th or something, in mid-December 2014. So if something happened after his arrest, it's, like, that is not going to be relevant under lynch, because that's not going to be something the defendant knew about at the time of the shooting in this case. Something that happened afterwards is not relevant under lynch. It hadn't happened before. So there's still no real concrete indication in this record exactly what the jury was deprived of hearing, if it's by the result of counseling effectiveness, for example. So this court has no ability, on this record, on direct appeal, to decide an ineffectiveness counsel claim in the defendant's favor on the ground of a showing of prejudice without an adequate record to do so, because this court doesn't really know what the defense wanted to put on, and without knowing that, there's no way this court could then assess whether a jury would have had, with these facts, and these facts are not at all favorable to the defendant, because he's got no justification for ending a fistfight with a firearm. He does it because his brother told him to do so. That's a strong inference. And he said he was afraid. He did testify he was afraid for his brother's life, but then in his testimony, he's subject to all kinds of credibility problems, because, you know, he was... I crossed his hand and heard vigorously about why he couldn't have just gone up and assisted physically without shooting or fired a warning shot. He was 6 to 10 feet away. Did his legs work? Yeah, of course his legs worked, but he says he was too much in shock to actually use his legs. And then the police see... Excuse me. He doesn't know what happened with the gun. He denies that the police would have wanted to talk to him after he killed the man, and then he stays away, reportedly for the reason that he likes to leave on the weekends, but arrested 53 days later in St. Louis, his explanation is just completely incredible, and a jury is not going to believe any of that. And then it's sort of the one bad apple spoils the lot adage applies, and the situation is the jury would reject the entirety of the defense testimony, which is incredible, including his claims that he shot the Martin Jackson because he was in fear of his brother's life. That would be something the jury could reject because of all the problems of defense credibility in the story. So, the... There's no showing here that the defense was... or the district court was hostile to this sort of evidence, because we don't know what the judge would have done if this had been offered in direct examination. So the fact that it was excluded on a procedural rule ground of having been adequately offered does not excuse the defense failure to present the offer of proof. And still, without the offer of proof, there's no showing strictly. So it should be the type of claim that could be either preserved for post-conviction review or potentially developed on practical remands, which I'll get to in a moment. And then, with respect to the serious provocation instruction... Oh, I'm sorry. The other thing before I read the other issue. They did concern about the lack of a lineage instruction, which is IPI number 3.12X. It was not given, but to show that that's another potential avenue for their ineffective assistance and counsel claim. But generally, the failure to give such an instruction is not considered prejudicial, unless it is so critical that it's omission is not denied for a trial. And the state's position is that it's omission is not so critical and that it's not denied for a trial as a result of the omission of that instruction. But it is one more issue they had for ineffective assistance, potentially, on post-conviction. With respect to sudden intense provocation and serious provocation... I'm sorry. Sudden intense passion and serious provocation of secondary murder, there's no showing of sudden intense passion. There's also no showing of serious provocation. And both are required. The defense is motivated by tears. There's no substantial physical injury here because it's the injury that causes the passion. And without the injury, there's no passion that would arise. And if you have such an intense passion that would rise in a reasonable person, that would create an irresistible impulse or an uncontrollable rage to act. In the Rice case they cited, it was an injury to a young child. Severe injuries are being inflicted to a young child. And this is his brother. There's no showing he was ever injured or that defendant thought he was being injured. So there's zero evidence of serious provocation. ... With respect to... I already addressed the problem of defense credibility. So the defense wants to say that he did prove the mitigating factor. This court should not take that out of the jury's hands. A jury could resolve the defense credibility against him. And this court should then uphold the jury's verdict on his failure to prove... the findings of the defense failure to prove the mitigating factor of imperfect defense of others. With respect to sentencing, just real quick on this, I do not have an objection to them citing House as supplemental authority. But House is a post-eviction challenge. It was also a mandatory life sentence. Well, this was effectively under buffer for over 40 years, so it could be considered... It is a de facto life sentence. But the main distinction there is not only is House being a post-eviction challenge, which has an adequate record, and this being an as-applied challenge contrary to Harris, the distinction that House makes with Harris is the fact that House is a post-eviction challenge. But the main distinction, also, is that House was a lookout. Wasn't it seen as a crime? And that fact was a point of emphasis in the public court. Whereas here, the defendant was an actual shooter. And so it's much easier for a person who's not the actual shooter, who's merely a lookout, to get relief on an element proportionate to the penalty clause, which House did, because this penalty would shock the conscience of the community. And the defense, I believe, erased both the element proportionate to the penalty clause and the Eighth Amendment. The Eighth Amendment doesn't apply to him yet. The Supreme Court hasn't said so yet. The U.S. Supreme Court, because he was over 18 at the time of the shooting, the element proportionate to the penalty clause potentially could apply, but the state believes that Harris would mandate that to be raised at a later point, not for the first time on appeal, without an evidentiary period to fight against the fact. Even if it should be entertained, or could be entertained, because the fact he was the shooter, a 50-year sentence, does not shock the conscience of the community. It's also not a greatly invariant purpose in law or manifestly disproportionate to the nature of defense, and therefore it's not excessive under general excessiveness principles. So the fact is, the defendant claims that he should get consideration of Miller factors. Well, he's still over 18, and Miller itself didn't apply to the defendant who is over 18, so I believe the L.A. has amended some statutes, but they don't apply to this sort of sentencing hearing that was held before those statutes. They've also instituted some sort of parole system, but again, it would not help this defendant yet, because that doesn't apply to a sentencing hearing conducted before that past effective date. So, essentially, if he wants to just keep raising Illinois proportional penalties, they'd have to be done so on a post-conviction challenge. The closing arguments, issues, the state believes they haven't met either first or second long-frame error. The evidence is not being close to balance, because there's no dispute the defendant shot Marcus Jackson. The question being whether there was strong justification or not, and because the defendant was so heavily impeached by the circumstances in the cross-examination, his lack of issues of credibility, what happened with the gun, his name is seen, his various explanations are just seen almost laughably false. Those means it was not first long-frame error. Second long-frame error is very hard to make. It has shown the defendant's denied a fair trial, and problematic references like smoke and mirrors, for example, they do implicate the defendant's denied a fair trial, but there has to be a strong showing the defendant was denied a fair trial to get second long-frame error, and some of the other complaints they make are not sustained by the record, so there isn't really a showing of repeated and multiple and extensive errors in closing argument, so therefore their second long-frame error arguments fail. And the last thing I'd like to talk about is Frankl remands, and the issue of retention of jurisdiction. The state raises the retained jurisdiction argument because in the ordinary case under Frankl and Moore, in some of the appellate court cases cited in Moore, when the Senate raises a post-trial motion that constitutes a motion directed against the judgment, which we told time for appeal under Rule 606b, if this court vacates any disposition of that motion, and returns the case to the trial court, with a mandate, for example, the trial court then disposes of that motion at some point. So if that were to happen here, we have a judgment that entered in 2016. The final judgment to be appealed from is the conviction and sentence in a criminal case. And the state's position is that a denial of due counsel under Frankl itself is not a final appealable judgment under Article 6, Section 6 of the Elmwood Constitution, nor is it otherwise provided for by Supreme Court rules such as Rule 604. So the point then is, how can the defendant take a new appeal in 2019 or 2020 from a judgment date of 2016, being the conviction and sentence? And it would have to be through 606b totally. But for 606b totally to apply, there would have to be a motion directed against the judgment, and it would have to be disposed of at some point, less than 30 days before that new notice of appeal. But here, the defendant makes a complaint in a motion for a psychiatric examination. It is an explicit claim under errors that has to be considered by the trial court, and was not. So therefore, he would be entitled to a criminal hearing, which he was not given. So the only way to remedy this, then, because the defendant will not have an ability to take a new appeal, would be to retain jurisdiction under Garrett. Now, the important part of Garrett here is that the court would not be deciding the appeal. The court cannot enter a judgment. This court cannot issue a mandate, because doing so would deprive this court of jurisdiction, because this court's jurisdiction would end 21 days after it issues a formal judgment. So this court also does not have the supervisory authority possessed by the Supreme Court of Illinois. So there's no way that this court can indefinitely retain jurisdiction upon issues while entering a judgment. So a limited remand under Garrett is solely for the purpose of generating a record here, complying with the Crankville Inquiry. The trial court would not be permitted to order a new trial, because this court would still have jurisdiction over the judgment that's on appeal. And this court would not have yet issued a judgment, and therefore, the trial court has no jurisdiction, can only comply with this court's order, but cannot do so in a way that would interfere with this court's review of the judgment that's still on appeal while this court retains jurisdiction. So the trial court would not be permitted to order a new trial or to hold a new trial. That train cannot leave the station. So how would it work, Ms. Brooks? Walk us through the process. Let's say that it goes back on the Crankville remand, and there's a finding that new counsel needs to be appointed, new counsel's appointed, and then the judge determines that there was ineffective assistance of counsel here, and defendant is entitled to a new trial. Oh, please do. Essentially what would happen is everything like you said, the trial court would put that in supplemental record and send it to this court, and this court's remand instructions, for example, would say, hold this hearing, do these things, send us the supplemental record, do so this within so many days, and then this court would take that supplemental record, the arguments of the parties, any supplemental arguments that this court wishes to entertain, either on motion or sui sponte, and then decide the appeal. This court gets one chance to enter a judgment. After no appeals filed from the judgment, one chance to enter a judgment, and 21 days later this court loses jurisdiction. So this has to be done before this court enters a judgment, and the trial court has no jurisdiction to vacate the judgment order in trial while this court still has jurisdiction over that judgment. And so if it ends up coming back to us as I previously explained, are you suggesting then that if appropriate, we order a new trial? If appropriate, that would be this court would have to do so because this court is the only court with jurisdiction while this case remains on appeal. Thank you. Thank you, counsel. Rebuttal, counsel? Yes, thank you. First of all, I disagree with the state's characterization that the questioning on direct or on redirect is improper. The cross-examination question that you asked. I lost my argument. Sure, so we had the testimony of your client, direct testimony, and now you're going to give us what the prosecutor asked on cross. So the Avery testified that he and his family had their lives threatened and that the fighting had been going on all summer. And then he responded affirmatively when the prosecutor asked if he thought Shaquille was in danger of being killed at any moment. Then he followed up with... Let me back you up just a little bit. You said he testified that their lives had been threatened all summer. Was that on direct or was that on cross? It was both. It was actually on both. There was a precursor to the question that was identified during the sidebar in which the prosecutor had objected to the redirect. But there was a brief follow-up question before he... See, Avery testified on cross that they had had their lives threatened all summer and then he testified that he felt they were in danger of being killed at any moment and the prosecutor followed up with whether that belief was based on whether Shaquille was severely injured and at that point Avery responded that it was based upon the fact that they had their lives threatened all summer. So the first part was whether they thought he was going to be killed at any moment and then came the part about the lives being threatened all summer. So I don't think... Again, as I pointed out in the brief, there was no objection by the prosecutor to have that statement either stricken. So it stands on the record. And then I think it was fair game to follow up with that on redirect. Sure, counsel could have done this better. He should have moved and eliminated. Though, as I explained at length in the brief, I don't... There's nothing in the Illinois law that says it's required but that's certainly the proper practice. But in any event, the reasoning wasn't just the procedural issue, which again, I disagree with. I think it was fair... This proper scope of redirect because of the prosecutor's own questions. So you leave that hanging out there where you have this threat, they were threatened all summer, then your obvious inclination is to try to develop that on redirect. And then I also think the trial court expressly stated that Avery was trying to raise a new defense. And that's just not... There's no lynch defense. I mean, the defense was raised in the answer. A lot of the trial testimony, even from the state's own witnesses, was directed towards what the state of mind was of Avery. I mean, we've got multiple witnesses saying, shoot, shoot, shoot. So, you know, and I do think in ReWD, which I cited, talks about the interplay between the right to present a defense and the procedural rule, how it's developed on the cross. And I don't think it's fair to say that a procedural rule could trump his right to present a defense. And I see my time is almost up, but I also say this was highly prejudicial because the jury was affirmatively misinformed as to how to view this evidence during the state's closing argument. They were clearly troubled by it. They deliberated for several hours and sent out three notes asking for Avery's testimony and asking for clarification on the mitigating factors. So, I think I developed that in the brief, and I developed the alternative argument of ineffectiveness. And I just want to make one brief point. You know, we didn't get into a lengthy discussion, as I know there's some cases pending in this district about jurisdiction. I'm happy to file a supplemental brief if the court wants. My concern is that making these issues raisable in his Krenkel inquiry turns out into a post-condition proceeding. And obviously, he doesn't have counsel yet at the Krenkel hearing. The whole purpose of Krenkel is to do the preliminary inquiry to determine if possible neglect is there, and to appoint counsel. I think there's multiple cases that says this is a discrete common law procedure that developed by the Illinois Supreme Court that allows the court to have jurisdiction after Krenkel remand. But again, I'm happy to address that. That wasn't gone into at length in any of our briefs, as I know it is in some of the cases currently pending. But again, I don't want to convert his Krenkel inquiry into a post-conviction petition because he doesn't have counsel, and I want the court to address his case. I have a couple questions for you. First of all, with respect to Krenkel, and I know we've had a concession regarding that, but it was a little strange to me, in reviewing the record, there seemed to be lots of discussion and concern about the fact that this motion that he filed, which, you know, where he raised ineffective assistance of counsel, that it was prepared by some unknown entity, or that it wasn't prepared by him? Do you know anything about that? I mean, he signed it. Well, I believe he had some familial health with the motion. I mean, he has sort of some educational difficulties, and as I pointed out in the pre-sentence investigation report, he had some developmental issues, and so I think there was some assistance there. Bottom line is that the state participated in this and provided authority that this was somehow improper because he's represented by counsel. We know that's not a proper way to conduct a Crankle inquiry, and the judge just said that he wasn't going to address it at all. And, I mean, at the very least, they should have brought an A3. These are questions they could have asked A3. I mean, that is something that could have been, you know, further developed had they followed the proper procedure. You heard my exchange with Ms. Brooks regarding, okay, tell us what the proper procedure would be. Why don't you walk us through quickly the proper procedure as far as if we do remand for Crankle and put the other things aside for now. What are you suggesting as to the proper procedure? Well, the proper procedure as I understand from Patrick would be to consider all my issues first, which is what my first argument is, but if you're not inclined to do that, to send it back, retain jurisdiction, have the preliminary inquiry, although the trial judge is no longer on the bench, so that might be a little bit difficult, but have the proper preliminary inquiry where A3 is ready to court and asks about this motion, and the court can consider whether there was possible neglect of this case and whether he adequately investigated it. He didn't even ask for BCX, which to me would be... Tell me your procedure. Oh, okay. You know, he could have asked, I mean, obviously... Okay, so if the trial court finds that counsel should be appointed, trial court does that in your scenario? Counsel should be appointed to further develop the ineffective assistance of counsel claim, and the trial court will ultimately decide whether that claim warrants a new trial or not. Now, that presents kind of a difficult issue, right? Which is why I think these claims should be raised, because his issue on the lynch is likely to reoccur even if there's a new trial. So that's why my suggestion is you should consider these issues in the first instance. I understand the position that this is akin to a post-trial motion, but I'm not sure that it really is, because you can raise a critical issue even after a counsel post-trial motion is decided. You could direct it towards sentencing. I mean, I think in Ayers, it was directed towards the potential for a motion to withdraw a guilty plea. So it's such a discrete procedure under the Illinois Supreme Court case law, but again, it's like this issue is like... These issues that I've raised are likely to recur. I mean, one of the issues was a sufficient challenge. So you think that the trial court can make a ruling on whether or not there should be a new trial, and actually hold a new trial before it ever came back to us? Well, I think it would have to, which is why to me it would make sense from an economy standpoint, and consistent with Patrick, to consider his direct appeal issues in the first instance. Because I actually think those would move the claim one prior. I mean, if you're inclined to give him a new trial based on the lynch issue, then why would you want to do a preliminary claim one prior? Alright, thank you counsel. Thank you very much. We'll take this matter under advisement and be in recess until the next case.